**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHAEL DEFRANCESCO<br>1200 Sandspring Road<br>Wilkes-Barre, PA 18702<br>And<br>FUNDING ZONE, LLC,<br>1200 Sandspring Road<br>Wilkes-Barre, PA 18702-8428<br><br>Plaintiffs,<br>v.<br>VERTICAL RAISE, LLC,<br>Registered Agents, Inc.<br>7533 S. Center View Court, Suite R<br>West Jordan, UT 84084<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | <br><br><br><br><br><br>Civil Action No<br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs Michael DeFrancesco ("DeFrancesco") and Funding Zone, LLC ("Funding Zone"), by and through undersigned counsel, bring this civil action against Defendant Vertical Raise, LLC ("Vertical Raise"), and aver as follows:

1.     This is a civil action arising from Defendant's breach of an Asset Purchase Agreement whereby Defendant purchased all of the assets comprising Plaintiff Funding Zone's fundraising business for an agreed purchase price of One million, Two Hundred and Fifteen Thousand dollars ($1,215,000) and has failed to perform its obligations under the contract.

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that the parties are from diverse states and the amount in controversy exceeds the statutory minimum.

3. Plaintiff Michael DeFrancesco is an adult individual domiciled in and a citizen of the Commonwealth of Pennsylvania residing at 1200 Sandspring Road, Wilkes-Barre, PA 18702.

4. Plaintiff Funding Zone, LLC is a Pennsylvania limited liability company with its principle place of business located at Pennsylvania located at 1200 Sandspring Road, Wilkes-Barre, PA 18702.

5. Defendant Vertical Raise, LLC is a Idaho limited liability company located in Utah with a principal place of business in Meridian, Idaho and Registered Agent at 7533 S. Center View Court, Suite R, West Utah 84084.

6. Accordingly, complete diversity of citizenship exists between Plaintiffs and Defendant.

7. The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000 because Plaintiffs seek recovery of not less than $503,000.00 in unpaid purchase price, together with prejudgment interest and other damages.

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

9. Pursuant to the Asset Purchase Agreement, Idaho law should be applied by the Court in this matter.

10. A substantial part of the events giving rise to Plaintiffs' claims occurred within the Middle District of Pennsylvania.

## FACTUAL BACKGROUND

11.    Under an Agreement between the parties, Defendant agreed to purchase the Funding Zone.

12.    Defendant agreed to an established Pennsylvania business working with High Schools as part of the sales agreement in the State to raise funds for sports teams and programs and make two installment payments to the Plaintiff Michael DeFrancesco.

13.    Defendant paid the initial installment of the purchase price of Seven Hundred and Twelve Thousand Dollars ($712,000.00) but has wrongfully refused to pay the remaining contractual installment of Five Hundred and Three Thousand Dollars ($503,000.00).

14.    Plaintiff Michael DeFrancesco has demanded payment of the additional funds owed and due under the contract, but Defendant has refused payment.

15.    After acquiring Funding Zone's goodwill, customer relationships, sales force, strategic partnerships, and business operations, Defendant retained the benefits of those assets while refusing to compensate Plaintiffs in accordance with the Agreement.

16.    Defendant's refusal to pay the remaining purchase price is allegedly based upon an earn-out calculation that improperly excluded fundraising activity generated through the very assets Defendant purchased, including fundraising generated by former Funding Zone sales representatives and customer relationships that Defendant acquired as part of the transaction.

17.   Defendant further exercised exclusive control over the records, reporting systems, customer assignments, fundraising platform, and sales information necessary to calculate the earn-out while refusing to provide Plaintiffs with complete information concerning those calculations.

18.   As a direct result of Defendant's breaches, Plaintiffs have sustained damages in excess of Five Hundred and Three Thousand Dollars ($503,000) together with prejudgment interest, post-judgment interest, costs, and such additional relief as the Court deems appropriate.

19.   Following the sale of assets to Defendant, Defendant continued operating the acquired business through former Funding Zone representatives, customer accounts, and fundraising activities.

20.   Plaintiff Michael DeFrancesco is the founder, owner, and managing member of Funding Zone, LLC.

21.   For more than 26 years, Mr. DeFrancesco built Funding Zone into one of Pennsylvania's leading school fundraising organizations through extensive investments in employee recruitment, customer development, strategic partnerships, marketing, and business expansion.

22.   Plaintiff Funding Zone, LLC was engaged in the business of providing fundraising services to high schools, athletic organizations, booster clubs, and charitable organizations throughout Pennsylvania and neighboring states.

23.   Through years of investment and business development, Funding Zone accumulated substantial goodwill, customer relationships, proprietary business methods,

sales representatives, strategic partnerships, referral sources, and recurring fundraising accounts.

24. Defendant Vertical Raise, LLC is engaged in the business of providing fundraising services throughout the United States and actively solicits, acquires, and operates fundraising businesses in numerous states, including Pennsylvania.

25. At all relevant times, Defendant acted through its officers, managers, employees, agents, representatives, and Chief Executive Officer, Paul Landers, each acting within the course and scope of their employment and authority.

26. By early 2025, Funding Zone had developed a valuable fundraising platform consisting not merely of customer accounts, but also long-standing business relationships, trained sales representatives, strategic vendor relationships, referral partnerships, and substantial goodwill throughout Pennsylvania.

27. Among Funding Zone's most valuable assets were its experienced sales force, longstanding customer relationships, proprietary fundraising systems, relationships with statewide athletic organizations, physical fundraising card operations, and numerous strategic business partnerships developed over many years.

28. Defendant recognized the value of these assets and initiated negotiations to acquire substantially all of Funding Zone's business operations. Defendant initiated negotiations as they admittedly did not have a large market presence in Pennsylvania.

29. Throughout the due diligence process, Plaintiffs fully cooperated with Defendant and disclosed extensive financial, operational, employment, customer, and business information requested by Defendant.

30. Defendant performed extensive due diligence over several months before electing to proceed with the acquisition.

31. Defendant's decision to purchase Funding Zone was based upon its evaluation of Funding Zone's established customer base, sales organization, representative network, historical fundraising performance, and anticipated retention of those assets following closing.

32. The transaction contemplated by the Asset Purchase Agreement was not merely the purchase of historical fundraising revenue or isolated customer accounts. Rather, Defendant agreed to purchase substantially all of the operating assets that comprised Funding Zone's established fundraising business.

33. The assets acquired by Defendant included Funding Zone's trade name, goodwill, customer relationships, sales representatives, proprietary business methods, referral sources, supplier relationships, strategic partnerships, and the ongoing business opportunities associated with those assets. The Agreement also required Plaintiff to assist in transitioning Funding Zone's representatives and customers to Defendant following the closing.

34. At the time of the transaction, Funding Zone's value extended well beyond its historical fundraising totals. The business derived substantial value from long-standing relationships developed by Plaintiff over many years with schools, athletic directors, coaches, booster organizations, statewide athletic associations, vendors, fundraising suppliers, and an experienced network of sales representatives operating throughout Pennsylvania.

35.    Defendant understood during its due diligence that Funding Zone's continued success depended upon preserving those relationships, successfully transitioning the sales representatives, maintaining customer confidence, and integrating the acquired business into Defendant's existing operations in a manner that would maximize customer retention and future fundraising activity.

36.    Defendant likewise understood that the earn-out provisions contained in Section 1.03 of the Asset Purchase Agreement were intended to measure the continued performance of the business that Defendant purchased and the successful transition of Funding Zone's operations following the acquisition.

37.    During the due diligence process, Plaintiff provided Defendant with extensive financial information, historical fundraising data, payroll records, tax records, representative information, customer information, and other business records concerning Funding Zone's operations. Plaintiff also disclosed the identities and status of Funding Zone's sales representatives, including Vince Devivo, and provided Defendant with employment and compensation records reflecting their relationship with Funding Zone.

38.    Based upon that due diligence, Defendant determined that Funding Zone's business possessed substantial value and agreed to purchase the business for $1,215,000 pursuant to the Asset Purchase Agreement.

39.    Following the closing, Defendant assumed exclusive ownership and control of the acquired business, including Funding Zone's customer relationships, fundraising platform, representative network, reporting systems, sales data, strategic partnerships, goodwill, and business operations.

40.    Defendant thereafter exercised exclusive control over the management of the acquired business, including the assignment of customer accounts, supervision of former Funding Zone representatives, administration of fundraising campaigns, implementation of business policies, collection of fundraising data, maintenance of sales records, and calculation of the contractual earn-out.

41.    As a result of Defendant's exclusive control over the acquired business and all information relating to its post-closing performance, Plaintiffs lacked the ability to independently monitor, verify, or audit the fundraising activity generated by the assets Defendant had acquired.

42.    Plaintiffs are informed and believe, and therefore aver, that Defendant exercised that exclusive control in a manner that failed to maximize the successful transition of the acquired business and instead adopted business decisions, account assignments, reporting practices, and calculation methodologies that materially reduced the fundraising activity credited to Funding Zone under the earn-out provisions while allowing Defendant to retain the full benefit of the acquired assets.

43.    Defendant's post-closing conduct included, among other things, the reassignment of former Funding Zone representatives, the failure to credit fundraising activity generated through relationships transferred as part of the acquisition, the exclusion of fundraising generated through business opportunities introduced by Plaintiff, and the use of calculation methodologies that materially reduced the amount Defendant claimed was payable under the Asset Purchase Agreement.

44.    Vertical Raise also failed to account for the substantial amount of new business generated by Funding Zone representatives during the transition period. Throughout that year, The Funding Zone representatives continued working their established territories and secured numerous new accounts through long-standing relationships, referrals, and their own sales efforts.

45.    Throughout the earn-out period, Defendant possessed exclusive access to the records necessary to determine whether the contractual benchmarks had been satisfied, including fundraiser reports, customer records, representative production reports, commission records, internal accounting records, and other business information that was not available to Plaintiffs.

46.    Defendant refused access to records related to the contractual benchmarks even upon formal demand.

47.    Plaintiffs are informed and believe that discovery will demonstrate that Defendant's administration of the acquired business, rather than the performance of the business itself, substantially affected the earn-out calculations upon which Defendant now relies to justify withholding the remaining purchase price.

48.    Defendant cannot simultaneously contend that the fundraising activity generated by former Funding Zone representatives belonged to Vertical Raise for purposes of ownership and customer goodwill while excluding that same fundraising activity from the earn-out calculations used to determine the purchase price owed under the Asset Purchase Agreement.

49.    During the due diligence process, Plaintiff fully cooperated with Defendant by producing financial information, sales reports, customer information, payroll records, representative information, tax documentation, and other business records requested by Defendant.

50.    Plaintiff specifically disclosed the identities of Funding Zone's sales representatives, including Vince Devivo, and provided Defendant with W-2 information and compensation records demonstrating that Mr. Devivo was employed by Funding Zone.

51.    Upon information and belief, Vertical Raise did not continue to utilize or credit Vince Devivo's full book of business to Plaintiffs' earn out which violated the terms of the asset purchase agreement.

52.    Furthermore, the earnout provision in the contract that Defendant now alleges was not met included full calculations of the Devivo book of business when in fact, Vertical Raise allowed portions of the Devivo book to walk away from their control and Vertical Raise failed to make the appropriate adjustment this loss of business which should have resulted in a reduction to the earn out provision in the asset purchase agreement.

53.    Plaintiff further advised Defendant that Funding Zone was in talks to acquire another fundraising company known as Black Bear Fundraising and that Black Bear represented an additional source of fundraising opportunities available to Defendant following the acquisition.

54.    While the acquisition of Black Bear Fundraising did not take place prior to the Defendant's purchase of the Funding zone, there was a strategic partnership in place.

55.    Plaintiff introduced Defendant to founder and owner of Black Bear Fundraising Tom Polijak and assisted Defendant in its acquisition of Black Bear Fundraising.

56.    The sale of Black Bear Fundraising and the business that it generated for the Defendant all originated from the Plaintiffs' efforts which were not made part of the earn out provision.

57.    Defendant conducted extensive due diligence concerning Funding Zone's financial performance, customer relationships, representative network, and anticipated retention.

58.    During those negotiations, Defendant's Chief Executive Officer, Paul Landers, expressed confidence that Funding Zone's customer retention would exceed ninety percent following the acquisition.

59.    Plaintiff fully performed all material obligations required under the Asset Purchase Agreement.

60.    Plaintiff introduced Defendant to Funding Zone's customers, representatives, vendors, suppliers, strategic partners, and referral sources.

61.    Plaintiff obtained executed Vertical Raise representative agreements from Funding Zone's representatives prior to closing.

62.    Plaintiff personally assisted Defendant in transitioning Funding Zone's operations and representatives following the acquisition.

63.    Plaintiff likewise introduced Defendant to the Pennsylvania Scholastic Football Coaches Association, a long-standing relationship developed by Plaintiff through years of financial support and professional involvement.

64.    Plaintiff introduced Defendant to vendors responsible for producing physical fundraising discount cards utilized by Funding Zone.

65.    Plaintiff further assisted Defendant by connecting Defendant with Pennsylvania legal counsel regarding intellectual property issues involving competing fundraising companies.

66.    Even after the sale closed, Plaintiff continued assisting Defendant beyond his contractual obligations in order to maximize retention of Funding Zone's customer relationships and representatives.

67.    At Defendant's request, Plaintiff returned to active fundraising responsibilities following the departure of another Vertical Raise representative in order to preserve customer relationships Defendant feared losing.

68.    Plaintiff continued generating fundraising business for Defendant after the acquisition.

69.    Upon information and belief, Defendant entered new and separate business agreements with Plaintiff's former sales representatives which directly impacted and reduced the earn-out credited to the Plaintiff. Plaintiff is informed and believes that Defendant internally reassigned former Funding Zone representatives, territories, customer accounts, and fundraising activity in a manner that prevented substantial fundraising revenue from being credited toward Funding Zone's earn-out calculation.

70. Upon information and belief fundraising generated by former Funding Zone representatives—including business generated through relationships developed while employed by Funding Zone—was excluded from Defendant's earn-out calculations despite constituting business derived from the assets Defendant purchased.

71. Defendant likewise failed to credit fundraising opportunities generated through Black Bear Fundraising despite Plaintiff introducing that business relationship to Defendant as part of the acquisition.

72. Defendant also altered its position concerning the continued use of physical fundraising discount cards after the acquisition, thereby negatively affecting customer retention and fundraising performance during the earn-out period.

73. Defendant made these operational decisions without consulting Plaintiff despite Plaintiff's continuing contractual role in assisting the transition.

74. Defendant took the above referenced action which directly diminished and impacted the Plaintiff's earn-out without lowering the earn out amount.

75. Defendant's actions were improper, against the intent of the parties at the time the asset purchase agreement was signed and was done to circumvent the terms of the contract.

76. On or about April 25, 2026, Defendant notified Plaintiff that no second payment would be made under the Agreement.

77. Defendant asserted that Funding Zone's retained fundraising totaled only $2,013,582.55 and claimed Plaintiff therefore was not entitled to the remaining purchase price.

78. Defendant subsequently asserted that Plaintiffs had sold business allegedly owned by Vince Devivo despite Defendant having received extensive due diligence concerning Mr. Devivo's employment relationship before closing.

79. In subsequent correspondence, Defendant acknowledged that a portion of the business associated with Mr. Devivo had not transitioned to Defendant and represented that Defendant would pay additional consideration once that business transitioned, thereby taking a position materially inconsistent with Defendant's earlier assertion that Plaintiff had no entitlement to the remaining purchase price.

80. Defendant's shifting explanations concerning the earn-out, treatment of Mr. Devivo's business, and methodology for calculating retained fundraising demonstrate the Defendant's improper reliance on its initial earn-out provision.

81. Plaintiff has fully performed all obligations required of him under the Agreement or has been excused from any further performance.

## COUNT I
## BREACH OF CONTRACT

82. Plaintiff incorporates by reference Paragraphs 1 through 81 as though fully set forth herein.

83. The Asset Purchase Agreement constitutes a valid and enforceable contract supported by adequate consideration. See Exhibit 1

84. Plaintiff fully performed all material obligations required under the Agreement, including transferring the purchased assets, assisting in the transition of

Funding Zone's representatives and customers, obtaining representative agreements, and providing post-closing consulting services requested by Defendant.

85.    Defendant breached the Agreement by improperly administering the earn-out provisions contained in Section 1.03 of the Asset Purchase Agreement and by conducting and transacting business with the acquired assets that was inconsistent with the best available business practices.

86.    Specifically, Defendant breached the Agreement by failing to properly calculate fundraising activity attributable to the assets purchased from Plaintiff.

87.    Defendant further breached the Agreement by excluding fundraising activity generated by former Funding Zone representatives that should have been credited toward the contractual earn-out calculation.

88.    Defendant further breached the Agreement by failing to properly account for fundraising activity generated from customer relationships, representatives, goodwill, and business opportunities transferred to Defendant as part of the Asset Purchase Agreement.

89.    Defendant further breached the Agreement by refusing to provide complete and accurate records supporting it earn-out calculations despite possessing exclusive control over the information necessary to verify those calculations.

90.    Defendant's interpretation and administration of the earn-out provisions deprived Plaintiff of the benefit of the bargain contemplated by the parties when they executed the Asset Purchase Agreement.

91. Defendant further breached this agreement by allowing Vince Devivo to alter his book of business that was sold to the Defendant without adjusting the earnout provisions of the contract.

92. Defendant further breached their agreement by improperly operating the business sold to them by Plaintiffs and for not giving reasonable effort to operations, marketing, administration and employment needs of said business.

93. As a direct and proximate result of Defendant's breaches, Plaintiff has sustained damages in an amount to be determined at trial but believed to exceed $503,000, together with prejudgment interest, post-judgment interest, costs, and such other relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant for compensatory damages, prejudgment interest, post-judgment interest, costs of suit, and all further legal and equitable relief the Court deems appropriate.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

94. Plaintiffs incorporate by reference Paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95. The Asset Purchase Agreement is a valid and enforceable contract governed by the laws of the State of Idaho.

96.     Under Idaho law, every contract contains an implied covenant of good faith and fair dealing requiring each party to perform its contractual obligations honestly, fairly, and in a manner consistent with the justified expectations of the contracting parties.

97.     The implied covenant required Defendant to exercise any discretion afforded under the Asset Purchase Agreement in a manner that was consistent with the parties' reasonable expectations and not for the purpose of depriving Plaintiffs of the benefits of the Agreement.

98.     Defendant possessed exclusive control over the acquired business following the Closing, including the management of customer accounts, assignment of sales representatives, operation of the fundraising platform, collection of fundraising revenue, maintenance of business records, calculation of retained fundraising, and administration of the contractual earn-out provisions.

99.     Plaintiffs had no practical ability to independently verify Defendant's administration of the acquired business or the accuracy of Defendant's earn-out calculations because Defendant maintained exclusive possession and control of the relevant business records and reporting systems.

100.    Plaintiffs are informed and believe, and therefore aver, that Defendant exercised its contractual discretion in bad faith by administering the acquired business in a manner that materially reduced the fundraising activity credited toward the contractual earn-out.

101.    Plaintiffs are further informed and believe that Defendant improperly excluded fundraising activity generated by former Funding Zone representatives despite Defendant's acquisition of those representatives, their customer relationships, and the goodwill associated with their fundraising activities.

102.    Defendant further failed to properly account for fundraising opportunities arising from business relationships, strategic partnerships, referral sources, and goodwill transferred as part of the Asset Purchase Agreement.

103.    Defendant also failed to administer the transition of the acquired business in a manner reasonably calculated to maximize customer retention and fundraising activity despite knowing that successful transition of those assets directly affected the contractual earn-out.

104.    Throughout the earn-out period, Defendant exercised unilateral control over the calculation methodology, reporting practices, customer assignments, and fundraising records used to determine Plaintiffs' entitlement to the remaining purchase price.

105.    Defendant thereafter relied upon the results of its own administration of the acquired business to deny payment of the remaining purchase price while retaining the benefits of the assets acquired from Plaintiffs.

106.    Plaintiffs further allege that Defendant's shifting explanations concerning the earn-out calculation, the treatment of Vince Devivo's business, the ownership of certain customer relationships, and the methodology used to calculate retained fundraising demonstrate that Defendant did not administer the earn-out consistently with the parties' justified expectations under the Asset Purchase Agreement.

107.    Defendant's conduct frustrated Plaintiffs' justified expectations under the Agreement and deprived Plaintiffs of the benefit of the bargain they reasonably expected to receive upon selling substantially all assets comprising the Funding Zone business.

108.    As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have sustained damages in an amount to be determined at trial but believed to exceed $503,000 together with prejudgment interest, costs, and such additional relief as the Court deems appropriate.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor and against Defendant for compensatory damages, prejudgment interest, post-judgment interest, costs of suit, and such additional relief as the Court deems just and proper.

## COUNT III
## EQUITABLE ACCOUNTING

109.    Plaintiffs incorporate by reference Paragraphs 1 through 108 of this Complaint as though fully set forth herein.

110.    This Count is pleaded in the alternative pursuant to Rule 8(d) of the Federal Rules of Civil Procedure.

111.    The Asset Purchase Agreement required Defendant to calculate the value of Funding Zone's retained business twelve (12) months after Closing using information that existed exclusively within Defendant's possession, custody, and control.

112.   Following the Closing, Defendant assumed exclusive ownership and control over the Funding Zone business, including but not limited to:

a. the Vertical Raise fundraising platform;

b. all fundraiser reporting;

c. customer account information;

d. representative assignments;

e. fundraiser launch reports;

f. fundraiser completion reports;

g. fundraising revenue reports;

h. commission records;

i. customer retention records;

j. internal accounting records;

k. CRM data;

l. spreadsheets used to calculate the earn-out;

m. communications among Defendant's officers, managers, and employees regarding the earn-out calculation; and

n. all electronic data reflecting fundraising activity generated by former Funding Zone representatives.

113.   Plaintiffs no longer possessed independent access to those records following the Closing.

114.   During the earn-out period, Defendant controlled all reporting used to determine whether the contractual benchmarks contained in Section 1.03 of the Asset Purchase Agreement had been satisfied.

115. Plaintiffs repeatedly requested reports, calculations, and information necessary to evaluate Defendant's earn-out determination.

116. Defendant failed and refused to provide complete information sufficient to permit Plaintiffs to verify Defendant's calculations.

117. Upon information and belief, Defendant possesses documents and electronically stored information reflecting fundraising activity that was not included within Defendant's earn-out calculations.

118. Upon information and belief, Defendant also possesses records identifying fundraising activity generated through former Funding Zone representatives that Defendant attributed to other Vertical Raise representatives, territories, business units, or internal reporting categories.

119. Plaintiffs are informed and believe that Defendant's internal records will identify fundraising activity generated through customer relationships, goodwill, strategic partnerships, and representative relationships transferred pursuant to the Asset Purchase Agreement that were excluded from Defendant's calculation of retained fundraising.

120. Plaintiffs further are informed and believe that Defendant possesses communications concerning:

> a. the treatment of Vince Devivo and his customer accounts;
>
> b. Black Bear Fundraising;
>
> c. physical discount card fundraising;
>
> d. reassignment of Funding Zone representatives;

e. territory assignments;

f. customer retention strategies;

g. the earn-out calculation methodology; and

h. discussions concerning whether certain fundraising activity would or would not be credited toward Plaintiffs' earn-out.

i. the retention, promotion and loss of revenues related to sales representative Michael Sekusky;

121.    Defendant also possesses records concerning fundraising generated after Plaintiff introduced Defendant to strategic business partners, including but not limited to Black Bear Fundraising, the Pennsylvania Scholastic Football Coaches Association, physical discount card vendors, and other referral relationships developed by Plaintiffs over many years.

122.    Plaintiffs have no adequate means of determining the amount due under the Asset Purchase Agreement without a complete accounting of Defendant's records because Defendant exclusively maintained the information necessary to calculate the earn-out.

123.    The financial information necessary to determine the amount owed under the Asset Purchase Agreement is unusually complex and cannot be determined solely from documents presently available to Plaintiffs.

124.    The amount of retained fundraising, the assignment of customer accounts, the treatment of former Funding Zone representatives, and the allocation of fundraising revenue are matters uniquely within Defendant's knowledge.

125.   Equity therefore requires that Defendant provide a complete accounting of all fundraising activity generated from the business acquired from Plaintiffs during the earn-out period.

126.   Specifically, Plaintiffs seek an accounting of all fundraising activity occurring between April 14, 2025, and April 14, 2026, including but not limited to:

a. every fundraiser launched by former Funding Zone representatives;

b. every fundraiser completed by former Funding Zone representatives;

c. all fundraising revenue generated by customer accounts formerly serviced by Funding Zone;

d. all fundraising generated through Vince Devivo;

e. all fundraising generated through Mike Petroski, Mike Sekusky, Haley Skove, Kyle Lindberg, Elise Smith, Tom Poljak, and all other former Funding Zone representatives;

f. all fundraising generated through Black Bear Fundraising;

g. all fundraising generated through physical discount card programs;

h. all commission reports;

i. all territory assignment reports;

j. all customer reassignment records;

k. all spreadsheets used to calculate the earn-out;

l. all reports reflecting retained fundraising;

m. all internal audits or reconciliations concerning the earn-out; and

n. all documents reflecting how Defendant calculated the figures communicated to Plaintiffs on or about April 25, 2026.

127. Plaintiffs further request that Defendant identify every fundraiser that Defendant excluded from the earn-out calculation together with the specific reason for each exclusion.

128. Plaintiffs further request that Defendant identify every fundraiser attributed to another Vertical Raise representative that Plaintiffs contend should have been attributed to Funding Zone for purposes of calculating the contractual earn-out.

129. Upon information and belief, Defendant reassigned a number of the Funding Zone's Accounts to Vertical Rise representatives after the purchase took place and failed to include these revenues in the earnout calculation.

130. Without a full accounting, Plaintiffs cannot determine the precise amount owed under the Asset Purchase Agreement.

131. An accounting is necessary to avoid unjustly permitting Defendant to rely upon financial calculations that remain exclusively within Defendant's possession and cannot otherwise be independently verified.

**WHEREFORE,** Plaintiffs respectfully request that this Court: Order Defendant to provide a full accounting of all fundraising activity generated by the assets purchased from Plaintiffs during the earn-out period; Require Defendant to produce all books, records, electronically stored information, reports, spreadsheets, CRM records, commission reports, accounting records, customer assignment records, and communications used in calculating the earn-out;

Furthermore, Plaintiff respectfully requests that this Court appoint a Special Master or forensic accountant pursuant to Rule 53 of the Federal Rules of Civil Procedure if necessary to conduct or supervise the accounting. Enter judgment in favor of Plaintiffs for all amounts determined to be due following the accounting and award prejudgment interest, post-judgment interest, costs of suit, and such other legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

**JERRY MARTILLOTTI & ASSOCIATES**

Gerard J. Martillotti, Esquire /s/
P.A. Identification No. 63474
Attorney for Plaintiff
4221 Ridge Ave.
P.O. Box 18509
Philadelphia, PA 19129
(215) 849-9040
Attorney for Plaintiff
*Martillottilaw@verizon.net*